Robert D. Shoecraft (SBN 96217)
Devin T. Shoecraft (SBN 255489)
**SHOECRAFT & ASSOCIATES**
750 B Street, Suite 1750
San Diego, CA 92101
Telephone: (619) 794-2280
Facsimile: (619) 794-2278
Email:  rshoecraft@shoecraftlaw.com
Email:  dshoecraft@shoecraftlaw.com

John P. O'Malley (pro hac vice pending)
**KARBAL, COHEN, ECONOMOU, SILK & DUNNE, LLC**
200 S. Wacker Drive, Suite 2550
Chicago, IL 60606
Telephone:   (312) 431-3700
Facsimile:    (312) 431-3670
jomalley@karballaw.com

Attorneys for Plaintiff, Those Certain Underwriters At Lloyd's, London subscribing to
Policy No. SUA WS20214-1801

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOSE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, subscribing to Policy No. SUA WS20214-1801 <br><br> Plaintiffs, <br><br> vs. <br><br> VOIP GUARDIAN LLC, a Delaware limited liability company; VOIP GUARDIAN PARTNERS I, LLC, a Delaware limited liability company; RODNEY OMANOFF, an individual; JEFFREY GREENBERG, as Trustee of the Marcia Kostrin Trust and the Professional Home Improvements Inc. Retirement Plan; OMANOFF AMERICA LLC, a Delaware limited liability company; | Case No. <br><br> **COMPLAINT FOR DECLARATORY RELIEF AND QUASI-CONTRACT REIMBURSEMENT, RESTITUTION, AND/OR UNJUST ENRICHMENT** <br><br> **JURY TRIAL DEMANDED** |

OMANOFF AMERICA TELECOM, LLC, a Delaware limited liability company; CONTACTS & CONTRACTS, LLC, a Delaware limited liability company; MUDMONTH, LLC, a Nevada limited liability company; PHILIPSON INTERNATIONAL LLC, a Delaware limited liability company; RICHARD OMANOFF, an individual; VOIP GUARDIAN PARTNERS II, LLC, a Delaware limited liability company, MARK PROTO, an individual; JOSEPH RAHMAN aka YOUSSEF A. RAHMAN, an individual; JOHN O. PHILIPSON, an individual; ADELA PHILIPSON, an individual; TIMOTHY YOO, Chapter 7 Trustee;

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Now comes Plaintiffs, Those Certain Underwriters at Lloyd's, London subscribing to Policy No. SUA WS20214-1801 ("Underwriters"), by and through the undersigned counsel, and herein submit their Complaint against Defendants, VOIP GUARDIAN LLC ("VoIP Guardian" or the "Named Insured"), a Delaware limited liability company; RODNEY OMANOFF, an individual; OMANOFF AMERICA LLC, a Delaware limited liability company; OMANOFF AMERICA TELECOM, LLC, a Delaware limited liability company; CONTACTS & CONTRACTS, LLC, a Delaware limited liability company; MUDMONTH, LLC, a Nevada limited liability company; PHILIPSON INTERNATIONAL LLC, a Delaware limited liability company; RICHARD OMANOFF, an individual; VOIP GUARDIAN PARTNERS I, LLC, a Delaware limited liability company ("VoIP GP I" or the "Debtor"); and VOIP GUARDIAN PARTNERS II, LLC, a Delaware limited liability company ("VoIP GP II"); MARK PROTO, an individual; JOSEPH RAHMAN aka YOUSSEF A. RAHMAN, an individual; JOHN O. PHILIPSON, an individual; ADELA PHILIPSON, an individual; TIMOTHY YOO, Chapter 7 trustee (the "Trustee"); and JEFFREY GREENBERG, ("Greenberg"), in his capacity as Trustee of the Marcia Kosstrin Trust

and the Professional Home Improvements Inc. Retirement Plan.   In support thereof, Underwriters allege as follows:

## STATEMENT OF THE CASE

1.   This action seeks a declaration pursuant to 28 USC §§ 2201-2202 and Fed. R. Civ. P. 57 that there is no duty to defend or indemnify several individuals and entities under a Professional Services Liability Policy No. SUA WS20214-1801 (the "Policy") issued to VOIP GUARDIAN LLC ("Named Insured") by Underwriters for liabilities arising out of three claims related to an alleged fraudulent scheme perpetuated by the Named Insured, its former principal, Rodney Omanoff ("Omanoff"), and other alleged officers, directors, and employees of VoIP Guardian and/or VoIP GP I.  Those three claims are: (1) *Marcia Kosstrin Trust and Professional Home Improvements, Inc. Retirement Plan v. Direct Lending Investments, LLC, Brendan Ross, Bruce Mason, Frank Turner, Rodney Omanoff, and Quarterspot, Inc*. Case no 2:19-cv-02452-JAK-MRW, filed in the United States District Court for the Central District of California (the "DLI Lawsuit"); (2) *Yoo v. Wavecrest (UK) Ltd., et al*., Case No. 2:21-ap-01046-BR, filed in the United States Bankruptcy Court for the Central District of California ("Wavecrest Lawsuit"); and (3) *Yoo v. VoIP Guardian LLC et al.,* Case No. 2:21-ap-01044-BR, filed in the United States Bankruptcy Court for the Central District of California (the "VoIP Lawsuit").  This action further seeks reimbursement in quasi-contract, restitution, and/or recovery for unjust enrichment, of all legal fees and expenses incurred in connection with the defense of Omanoff, VoIP Guardian, and VoIP GP II in the DLI Lawsuit, the Wavecrest Lawsuit, and the VoIP Lawsuit.

2.   On February 28, 2023, the United States Bankruptcy Court for the Central District of California entered an order approving the stipulation between the Trustee and Underwriters regarding relief from the automatic stay under 11 U.S.C. § 362 to allow Plaintiffs to file this Complaint for Declaratory Relief and Reimbursement of Defense Expenses in the United States District Court for the Central District of

Case 2:23-cv-03710-DSF-MRW   Document 1   Filed 05/15/23   Page 4 of 48   Page ID #:4

California. A copy of the Bankruptcy Court Order of February 28, 2023 is attached hereto as **Exhibit 1**.

3.     VoIP Guardian is an entity that provides accounts receivable factoring services to small "Tier 3" telecommunications companies that route international calls to larger "Tier 1" telecommunications companies.   VoIP Guardian provides such factoring services through its 100% owned subsidiary, VoIP GP I, the Debtor in a Chapter 7 bankruptcy captioned *In re VoIP Guardian Partners I, LLP*, case No. 2:19bk-12607-BR (Bankr. C.D. Cal.) (the "Bankruptcy Case").   To fund its factoring services, VoIP Guardian receives investment capital from various investment sources including funds that pool money from private investors.

4.     In the DLI Lawsuit, investors in VoIP Guardian, the Marcia Kosstrin Trust and the Professional Home Improvements Inc. Retirement Plan, by and through their trustee, Greenberg, allege that VoIP Guardian, a subsidiary and its directors and officers deliberately or recklessly mismanaged the investors' funds by engaging in a complex telecom factoring scheme with questionable foreign entities. They allege that a VoIP Guardian subsidiary financed the transactions of numerous smaller telecommunication companies despite red flags that should have put their directors and officers on notice that those companies were not legitimate entities. They allege that, as a result, essentially all of the money invested in the VoIP Guardian subsidiary is now uncollectible.

5.     In the Wavecrest Lawsuit, the Trustee for VoIP GP I alleges that VoIP GP I is the true factor under several factoring agreements with Tier 3 carriers that reference VoIP GP II as the factor.   The Trustee seeks a declaration that receivables under the subject factoring agreements are assets of VoIP GP I's bankruptcy estate and do not belong to VoIP GP II.

6.     In the VoIP Lawsuit, the Trustee alleges that the Debtor's directors and officers mismanaged the Debtor's affairs through an ill-conceived telecom factoring scheme that resulted in significant investor losses for which the Trustee seeks recovery.

**4**
**COMPLAINT**

7. Underwriters seek a declaration that: a) there is no coverage under Underwriters' Policy for Omanoff, VoIP Guardian, VoIP GP I, VoIP GP II, or any other "Insureds" under the Policy with respect to the DLI Lawsuit, the Wavecrest Lawsuit, and the VoIP Lawsuit and that Underwriters therefore have no obligation to defend or indemnify Omanoff, VoIP Guardian, VoIP GP I, VoIP GP II, or any other "Insureds" under the Underwriters' Policy with respect to the DLI Lawsuit, the Wavecrest Lawsuit, and the VoIP Lawsuit; that b) Underwriters may withdraw from and cease defending Omanoff, VoIP Guardian, VoIP GP I, VoIP GP II, or any other "Insureds" under the Underwriters' Policy with respect to the DLI Lawsuit, the Wavecrest Lawsuit, and the VoIP Lawsuit ; and that c) based upon Underwriters' initial and restated express written reservations of all rights to seek recovery and reimbursement of all sums paid under the Policy, Underwriters are entitled to recoup all the monies they have paid to date for defense fees and costs and may hereafter pay as defense fees and costs until such time as a final adjudication is made in connection with this lawsuit relieving Underwriters from their defense of Omanoff, VoIP Guardian, VoIP GP I, VoIP GP II, or any other "Insureds" under the Underwriters' Policy with respect to the DLI Lawsuit, the Wavecrest Lawsuit, and the VoIP Lawsuit as those defendants have received the benefit of an unwarranted defense.

## **PARTIES**

8. Plaintiffs, Those Certain Underwriters at Lloyd's, London which subscribe to Policy Number SUA WS20214 1801 consist of sole member Syndicates MKL 3000[1] and CSL 1084[2] whose corporate members are foreign companies with principal places of business in London, England and are organized under the laws of the United Kingdom.

---

[1] Syndicate MKL 3000 is otherwise referred to as Markel Capital Limited and has 17.5% of the security for the Policy.

[2] Syndicate CSL 1084 is otherwise referred to as Chaucer Corporate Capital (No.3) Limited and has 82.5% of the security for the Policy.

9.     VoIP Guardian (sometimes referred to as the "Management Company") is a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York.  The members of VoIP Guardian are the Defendants Mudmonth, LLC, Philipson International, LLC, Contacts & Contracts, LLC, and Omanoff America, LLC.

10.    VoIP GP I is a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York.  VoIP GP I is currently in Chapter 7 Bankruptcy in the United States Bankruptcy Court for the Central District of California, Los Angeles Division, Case No. 2:19-bk-12607-BR.  Pursuant to that Court's February 28, 2023 Order regarding relief from the automatic stay, VoIP GP I may be named in this complaint solely due to the fact VoIP GP I is an insured under the Underwriters' Policy, and any judgment, ruling, or order entered in this action shall not be collateral estoppel or res judicata as to the rights or obligations of VoIP GP I under the policy. The sole member of VoIP GP I is VoIP Guardian, which is organized under the laws of the State of Delaware with its principal place of business in New York.

11.    VoIP GP II is a limited liability company organized under the laws of the State of Delaware with its principal place of business in the State of Delaware.

12.    Omanoff is an individual domiciled in the State of California.

13.    The Marcia Kosstrin Trust is a Connecticut trust whose trustee is Greenberg, an individual person domiciled in the State of Connecticut. Professional Home Improvements Inc. Retirement Plan is a self-directed retirement plan, whose trustee is Jeffrey Greenberg, an individual person domiciled in the State of Connecticut. Greenberg  is named in this suit in his capacity as the trustee for these respective trusts. As these trusts are the plaintiffs in the DLI Lawsuit, their trustee is a proper defendant in an action for declaratory relief to determine the scope of coverage under Underwriters' Policy.  (*Canadian Ins. Co. v. Rusty's Island Chip Co.,* 36 Cal.App.4[th] 491, 496 (Cal. Ct. App. 1995).)

14.     Omanoff America Telecom, LLC is a limited liability company organized under the State of Delaware with its principal place of business in New York.  The sole member of Omanoff America Telecom, LLC is Omanoff.  Omanoff America Telecom, LLC has asserted it is an insured under the Underwriters' Policy and has sought a defense with respect to the VoIP Lawsuit.

15.     Omanoff America LLC is a limited liability company organized under the State of Delaware with its principal place of business in New York.  The sole member of Omanoff America LLC is Omanoff.  Omanoff America LLC has asserted it is an insured under the Underwriters' Policy and has sought a defense with respect to the VoIP Lawsuit.

16.     Contacts & Contracts, LLC is a limited liability company organized under the State of Delaware with its principal place of business in New York.  Contacts & Contracts, LLC has asserted it is an insured under the Underwriters' Policy and has sought a defense with respect to the VoIP Lawsuit.

17.     Mudmonth, LLC is a limited liability company organized under the State of Nevada with its principal place of business in California. Upon information and belief, the sole member of Mudmonth LLC is Mark Proto, who is an individual person domiciled in California.

18.     Philipson International LLC is a limited liability company organized under the State of Delaware with its principal place of business in California.  The sole member of Philipson International LLC is John Philipson, an individual person domiciled in the State of Florida.

19.     Adela Philipson ("A. Philipson") is an individual person domiciled in the State of Florida.

20.     Richard Omanoff is an individual person domiciled in the State of New York.  Richard Omanoff has asserted he is an insured under the Underwriters' Policy and has sought a defense with respect to the VoIP Lawsuit.

21. Mark Proto ("Proto") is an individual person domiciled in the state of California.

22. Joseph Rahman aka Youssef Rahman ("Rahman") is an individual person domiciled in the State of Florida.

23. John O. Philipson ("Philipson") is an individual person domiciled in the State of Florida. Philipson has asserted that he is an insured under the Underwriters' Policy and has sought a defense with respect to the VoIP Lawsuit.

24. The Trustee, Timothy Yoo, is an individual person domiciled in the state of California and serves as Trustee for the bankruptcy estate of VoIP GP I. As Yoo, in his capacity as Trustee, is the plaintiff in the Wavecrest Lawsuit and VoIP Lawsuit, Yoo is a proper defendant in an action for declaratory relief to determine the scope of coverage under Underwriters' Policy.

## JURISDICTION AND VENUE

25. This Court has concurrent jurisdiction over this matter pursuant to 28 U.S.C.§1334(b) and 28 U.S.C. §1367, in that this case arises from and/or is related to a proceeding filed under title 11 of the United States Code, *In re VoIP Guardian Partners, I, LLP*, Case No. 2:19bk-12607-BR (Bankr. C.D. Cal.).

26. Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §2201 permit Underwriters to seek a declaration from this Court as to the rights and obligations among and between the parties in relation to the Policy issued by Underwriters, including, but not limited to, whether Underwriters have an obligation to provide a defense to or indemnify any of the Defendants named in the DLI Lawsuit, the Wavecrest Lawsuit, and the VoIP Lawsuit.

27. Venue is proper because this dispute arises out of events that occurred in Los Angeles County and because the three underlying lawsuits are filed in the Central District of California.

## THE DLI DEFAULT AND KOSSTRIN TRUST VERSUS OMANOFF

28.     On or about February 21, 2019, the Named Insured's insurance broker tendered on behalf of its client three documents to Underwriters regarding the business operations of VoIP Guardian.

29.     The three documents tendered by the Named Insured's insurance broker were (1) Notice of Event of Default from Direct Lending Investors, LLC (February 1, 2019), (2) Notice of Acceleration from DLI (February 1, 2019), and (3) Important Confidential Investor Communication, from DLI, dated February 11, 2019 (the "ICIC").

30.     The Notice of Event of Default and Notice of Acceleration, addressed to VoIP GP I, notifies VoIP GP I that DLI considers VoIP GP I to be in default under their credit agreement due to failure to pay, and that DLI funds are due immediately.

31.     The ICIC further elaborates on the relationship between the entities and the alleged default of VoIP GP I, and states that DLI "now suspect[]s the cessation of payments is likely the result of misconduct ... and that a substantial portion of the $160 million may not be recoverable." The ICIC informs DLI's investors that the matter is being presented to law enforcement and to counsel for potential litigation.

32.     In a February 28, 2019 letter, Underwriters informed Omanoff that the above-referenced communications did not constitute a "Claim" as defined in the Policy, further stating that Underwriters' February 28, 2019 letter did not constitute a denial of coverage.

33.     On or about March 11, 2019, VoIP GP I filed its petition for Chapter 7 Bankruptcy in the United States District Court for the Central District of California.

34.     On or about April 1, 2019, the DLI Lawsuit was filed as a proposed Class Action Complaint. A true and correct copy of the operative complaint in the DLI Lawsuit is attached hereto at **Exhibit 2.**

35.     On or about April 9, 2019, the DLI Lawsuit was tendered to Underwriters by the Named Insured's insurance broker on behalf of Omanoff.

36.     On or about June 12, 2019, Underwriters advised Omanoff that they would provide Omanoff with a defense of the DLI Lawsuit through "independent *Cumis* counsel" subject to a written reservation of all of Underwriters' rights to disclaim any and all obligations under the Policy, including, but not limited to, the right to deny the claim and to recoup all defense fees and costs paid by Underwriters.

37.     Plaintiffs in the DLI Lawsuit and members of the putative class are "Limited Partners" in the Direct Lending Income Fund, L.P. (the "Fund"), a limited partnership that lends money through affiliates to small and medium sized businesses. (Ex. 2 at ¶ 1).

38.     The Fund is a "feeder fund" that invests capital in another fund, DLI Capital Inc. (the "Master Fund").  The Master Fund also invests for Direct Lending Income Feeder Fund, Ltd, a Cayman-Island corporation for non-U.S. domiciled investors (the "Offshore Fund").  The Fund, the Master Fund and the Offshore Fund are collectively referred to as the "Funds."

39.     The Fund is managed by Direct Lending Investment LLC (described therein as the "General Partner"). (Ex. 2 at ¶ 2).

40.     The DLI Lawsuit alleges that VoIP Guardian is engaged in the business of "factoring" financing to small telecommunications companies. Essentially, VoIP Guardian purchases accounts receivable from small telecom companies at a discount and collects on those accounts receivable from large telecom companies. (Ex. 2 at ¶ 4).

41.     The DLI Lawsuit names Omanoff as a defendant, identifying him as the founder and principal of VoIP GP I, and as the individual who controls all of the VoIP Guardian entities, either directly or through entities he controls. (Ex. 2 at ¶ 20).

42.     Among the other defendants is DLI, identified as the General Partner and Investment Manager of the Fund, and QuarterSpot, Inc. ("Quarterspot"), a lending platform for small businesses and alleged recipient of investments from the Fund. In addition, the DLI Complaint names Brendan Ross ("Ross"), identified as the founder and chief executive officer of DLI (until his resignation in March 2019), and two other

DLI executives (Bryce Mason ("Mason") and Frank Turner ("Turner")). Ross, Mason, and Turner are sometimes referred to collectively as the "DLI Individual Defendants." (Ex. 2 at ¶ 15-19).

43. The DLI Complaint states that the Fund provides a revolving loan facility to VoIP GP I, which uses the loan proceeds to provide factoring financing to small telecommunications companies (sometimes referred to herein as "Tier 3 Carriers"). These Tier 3 Carriers provide services to larger telecommunications companies (sometimes referred to herein as "Tier 1 Carriers"), and VoIP GP I purchases the resultant accounts receivable from the Tier 3 Carriers at a discount. According to the DLI Complaint, as of December 31, 2018, approximately 24% of the Funds' capital was invested in VoIP GP I. (Ex. 2 at ¶ 53).

44. The Fund alleges it initially encountered Omanoff through his other "factoring" entities, referred to collectively as "Talking Capital." (Ex. 2 at ¶ 58).

45. The DLI Complaint alleges the relationship between Talking Capital and Omanoff soured, leading to a lawsuit in February 2017 by a founding member of Talking Capital against VoIP GP I, Omanoff, Omanoff-related entities, DLI, Ross (DLI's founder and CEO), and the Funds (the "Talking Capital Lawsuit").

46. The DLI Complaint alleges that the Talking Capital Lawsuit concerned two distinct courses of alleged wrongdoing. One was an alleged breach of fiduciary duty by Ross, the Funds, and certain Omanoff-related defendants because of their formation and funding, respectively, of VoIP GP I, which the suit alleges was a direct competitor of Talking Capital. The other was that Omanoff caused Talking Capital to invest and lose $8.5 million in Bolotel, Ltd ("Bolotel"), a UK-based Tier 3 carrier without meaningful due diligence; Bolotel allegedly "disappeared under suspicious circumstances." (Ex. 2 at ¶ 59).

47. With regard to the Bolotel transaction, the Talking Capital Complaint alleges that in 2015, Omanoff, Proto and Rahman caused Talking Capital to suffer substantial losses when they imprudently made a reckless lending decision to finance the

Tier 3 European service provider known as Bolotel.  The Talking Capital Complaint alleges that Omanoff, Mark Proto and Rahman failed to conduct any due diligence or investigate the history of Bolotel.  The Talking Capital Complaint includes causes of action for Breach of Contract, Breach of Fiduciary Duty, Misappropriation of Corporate Opportunity, Breach of Restrictive Covenant, Aiding and Abetting Breach of Fiduciary Duty, Breach of Duty of Care, and Tortious Interference with Contract and seeks relief against VoIP Guardian, Omanoff, Proto, Rahman, and VoIP GP I, among others.  A copy of the operative third amended complaint in the Talking Capital Lawsuit is attached hereto as **Exhibit 3** ("Talking Capital Complaint").

48.    The DLI Complaint contains a single cause of action against Omanoff for Aiding and Abetting Breaches of Fiduciary Duties (Count VI).  (Ex. 2 at ¶¶ 133-136).

49.    The DLI Complaint demands rescission, restitution, disgorgement, injunctive and other equitable relief, compensatory damages, punitive damages, attorneys' fees and costs, and interest. (Ex. 2 at ¶¶ 148-152).

## YOO VERSUS WAVECREST

50.    On March 10, 2021, the Trustee filed the Wavecrest Lawsuit as an adversary proceeding in the Bankruptcy Case.  A true and correct copy of the Wavecrest Complaint is attached hereto as **Exhibit 4**.

51.    The Wavecrest Complaint names as defendants Wavecrest (UK) Ltd. ("Wavecrest"), Interstach GMBH ("Interstach"), Ewa Barbara Madraszek ("Madraszek"), Plus AMA Plus AG ("AMA"), Thangarajah Gunabalsinkam ("Gunabalsinkam"), and VoIP GP II.

52.    On or about March 15, 2021, counsel for Omanoff and VoIP Guardian tendered the Wavecrest Complaint to Underwriters under the Policy on behalf of VoIP GP II.

53.    On April 14, 2021, Underwriters advised VoIP GP II that Underwriters would provide a defense of the Wavecrest Lawsuit through "independent *Cumis* counsel" subject to a written reservation of all of Underwriters' rights to disclaim any

and all obligations under the Policy, including, but not limited to, the right to deny the claim and to recoup all defense fees and costs paid by Underwriters.

54.     The Wavecrest Complaint alleges that Interstach and AMA provided services to Wavecrest, financed by VOIP GP I, with DLI investment funds. (Ex. 4 at ¶¶ 4, 8-9).

55.     The Wavecrest Complaint alleges that, as early as December 2016, Omanoff knew that Wavecrest raised a number of red flags, but nevertheless VoIP GP I entered into factoring agreements and assignments with Interstach and AMA.  (Ex. 4 at ¶¶ 25-27, 32-33).

56.     The Wavecrest Complaint further alleges that the factoring agreements reference VoIP GP II as the factor, but the Trustee believes that VoIP GP I actually provided the financing, and notes that VoIP GP I has claimed such losses in its bankruptcy schedule. (Ex. 4 at ¶10).

57.     The Trustee seeks recovery from both the Tier 1 and Tier 3 companies, as well as the personal guarantors, and also seeks declaratory relief against VoIP GP II regarding ownership of the claims against the co-Defendants. (Ex. 4 at ¶ 11).

58.     The first claim for relief is based on breach of contract and is directed against all defendants for breaching their obligations to pay the remaining balances. While the claim states that it is against all defendants, it appears to refer to only Wavecrest, AMA, Interstach, Madraszek, and Gunabalsinkam and seeks recovery of the approximately $9.5 million and $3.53 million balances due relating to Interstach-Wavecrest and AMA-Wavecrest, respectively. (Ex. 4 at ¶ 40).

59.     The second claim for relief is against all defendants on a theory of unjust enrichment. While the claim states that it is against all defendants, it appears to refer to only Wavecrest, AMA, Interstach, Madraszek, and Gunabalsinkam when alleging that these defendants received a benefit which was unjustly retained by them and should be reimbursed. (Ex. 4 at ¶ 44).

60.     The third claim for relief is against VoIP GP II on a theory of declaratory relief. The Wavecrest Complaint states that VoIP GP I funded the loans to Interstach and AMA, but VoIP GP II is listed in the agreements as the "factor." The Trustee seeks a declaration that the amounts owed by the defendants belong to VoIP GP I, the debtor, and not VoIP GP II. (Ex. 4 at ¶¶ 49-52).

## YOO VERSUS VOIP GUARDIAN

61.     On March 10, 2021, the Trustee filed the VoIP Lawsuit as an adversary proceeding in the Bankruptcy Case.  A Second Amended Complaint was filed in the VoIP Lawsuit on August 17, 2021 (the "VoIP Complaint").  A true and correct copy of the VoIP Complaint is attached hereto as **Exhibit 5.**

62.     The VoIP Complaint names numerous Defendants, but most pertinent to the instant matter are defendants VoIP Guardian, Omanoff, Proto, Rahman and Phillipson.

63.     The VoIP Complaint alleges that Omanoff, Proto, Rahman, and Phillipson were directors and/or officers of VoIP GP I and/or VoIP Guardian. The VoIP Complaint also alleges that Philipson was the managing partner of VoIP Guardian. (Ex. 5 at ¶¶ 22, 35, 48).

64.     On or about March 15, 2021, counsel for Omanoff and VoIP Guardian tendered the VoIP Lawsuit to Underwriters on behalf of VoIP Guardian, Omanoff, Richard Omanoff, Omanoff America, LLC, Contacts & Contracts, LLC, and Omanoff America Telecom, LLC.

65.     On or about April 14, 2021, Underwriters advised Omanoff and VoIP Guardian that Underwriters would provide them a defense of the VoIP Lawsuit through "independent *Cumis* counsel" subject to a written reservation of all of Underwriters' rights to disclaim any and all obligations under the Policy, including, but not limited to, the right to deny the claim and to recoup all defense fees and costs paid by Underwriters.

66.     On or about August 17, 2021, by way of written correspondence, Underwriters advised Richard Omanoff, Omanoff America, LLC, Contacts & Contracts, LLC, and Omanoff America Telecom, LLC that they were not insureds under the Policy.

67.     According to the VoIP Complaint, Omanoff was in control of VoIP GP I's operations, but he was assisted by several "key players," including Proto, Philipson, Rahman, and the co-Defendant DealDefenders LLC ("DealDefenders") and Jeff Ellentuck (DealDefenders's principal). (Ex. 5 at ¶¶ 56).

68.     The VoIP Complaint contains a lengthy description of the DLI Lawsuit and the activities of Talking Capital. (Ex. 5 at ¶¶ 66-72).

69.     The VoIP Complaint alleges that the directors and officers of VoIP GP I did little to no due diligence on the two main loan recipients, Najd Technologies Limited ("Najd") and Telacme Limited ("Telacme"), which loans have since been designated as "uncollectible" in the amount of $160 million. The VoIP Complaint alleges additional irregularities and evidence of fraud and/or lack of due diligence with respect to Najd and Telacme. (Ex. 5 *passim.*)

70.     The VoIP Complaint alleges that Omanoff, Proto and/or Rahman created Najd and Telacme and that those companies were not legitimate Tier 3 operating entities, but rather were created to generate the appearance of profitability and further investment by DLI. (Ex. 5 at ¶ 101).

71.     The VoIP Complaint alleges that some, if not all of VoIP GP I's principals knew or should have known that Telacme and Najd were not legitimate business operations. (Ex. 5 at ¶ 113).

72.     The VoIP Complaint alleges that millions of dollars have been transferred between related entities, using DealDefenders as a conduit or custodian of the funds to be transferred to the initial transferee. As pertinent here, the Trustee seeks to hold the following individuals jointly and severally liable for transfers from VoIP GP I to other individuals and/or entities:

- Omanoff - for all transfers from VoIP GP I to himself, Omanoff America Telecom, LLC, Omanoff America, LLC, Contacts & Contracts, Inc., Owl America, Inc. the property at 1221 Ocean Avenue, Unit 507, in Santa Monica, California, and Richard Omanoff.

- Philipson – for all transfers from VoIP GP I to Philipson and Philipson International LLC (a company owned and controlled by Philipson).

- Proto – for all transfers from VoIP GP I to himself, Arco Telecom (a company from which Proto earns commissions), and Mudmonth LLC (a company owned and controlled by Proto).

- Rahman – for all transfers from VoIP GP I to Zoom-Tel (a company owned and controlled by Rahman) and Go2Tel.

(Ex. 5 at ¶¶ 129-143).

73.    The Trustee also seeks to recover all transfers made by VoIP GP I to VoIP Guardian (VoIP GP I's management company), in the approximate amount of $59,364,318.61 over a 4-year period. In this regard, the VoIP Complaint alleges that VoIP Guardian received a 4.5% "factor fee" on any profit earned by VoIP GP I (effectively any amounts in excess of the principal and interest paid to DLI). The VoIP Complaint alleges that these profits obtained by VOIP Guardian were "illusory." (Ex. 5 at ¶¶ 164-166).

74.    The Trustee also seeks to hold Omanoff and Philipson, who exercised control over VoIP Guardian, jointly and severally liable for fraudulent transfers from VoIP GP I and/or others on behalf of VoIP GP I to VoIP Guardian in the amount of $59,364,318.61. The VoIP Complaint also alleges that the monies distributed by VoIP Guardian to Omanoff, Philipson, Proto, Rahman, and their related companies are subject to "claw back" because they were fraudulent transfers funded with "phantom profits" paid by an insolvent debtor. (Ex. 5 at ¶¶ 167-169).

75.    The VoIP Complaint alleges that the individuals who participated in the subject telecom factoring scheme are not protected by any fiduciary or corporate shield

and are alter egos of their respective entities. In this regard, the VoIP Complaint alleges that Omanoff, Philipson, Proto and Rahman worked in concert with the entities identified in the chart below to defraud. (Ex. 5 at ¶¶ 170-177).

**TABLE A: Individuals and Their Affiliated Entities**

| Individual: | Working in Concert With: |
|---|---|
| RODNEY OMANOFF [Exhibits 1-7] | • VoIP Guardian LLC<br>• Omanoff America Telecom, LLC<br>• Omanoff America, LLC<br>• Contacts & Contracts, Inc.<br>• Owl America, Inc.<br>• Richard Omanoff<br>• |
| JOHN O. PHILIPSON [Exhibits 8-9] | • Philipson International, LLC |
| MARK PROTO [Exhibits 11-13] | • Mudmonth, LLC<br>• Arco Telecom Ltd[2] |
| JOSEPH RAHMAN [Exhibits 14, 23] | • Zoom-Tel, Inc.<br>• Go2Tel Inc. |
| COLIN ECCLES [Exhibits 15-16] | • LTDTEL |
| TAREK KATIT [Exhibits 17-19, 22] | • Tee Telecommunications Inc.<br>• 2365 Azure LLC<br>• Overseas Charters Inc. |

**IMPROPER ORCHESTARTION OF THE CLAIM BY *CUMIS* COUNSEL**

76.     On February 22, 2022, coverage counsel for VoIP Guardian, Omanoff, Richard Omanoff, Omanoff America, LLC, Contacts & Contracts, LLC, and Omanoff America Telecom, LLC (collectively, the "Omanoff Parties") sent an email to counsel for Underwriters, stating: "Certain information has come to our attention regarding Insureds Rodney Omanoff, VoIP Guardian LLC, and VoIP Guardian Partners II LLC's, claim for coverage under Lloyds E&O Policy Certificate No. SUA WS20214-1801. We would like to discuss this information with you as soon as possible.  Please let us know your availability for a call today or tomorrow."

77.     On February 23, 2022, counsel for Underwriters and coverage counsel for the Omanoff Parties held a telephone conference.  During that telephone call, coverage counsel for the Omanoff Parties advised that: (1) Omanoff had learned that his former independent *Cumis* defense counsel, Cynthia Cohen, had provided comments and/or edits to the Second Amended Complaint filed by the Trustee for the purpose of trying to trigger coverage; and (2) Ms. Cohen had advised counsel for the Omanoff Parties that she and counsel for the Trustee had "discussed" a purported "policy limits" demand made by the Trustee on December 10, 2021 before it was sent, that the demand was a "sham," that there was no expectation that the demand would be accepted, and that the purpose of the demand was solely to set Underwriters up for an alleged bad faith claim.

**THE UNDERWRITERS' POLICY**

78.     On September 20, 2018, Underwriters issued a claims made Professional Services Liability Policy to VOIP Guardian, **Policy No. SUA WS20214-1801**, for the **POLICY PERIOD**[3] 9/1/2018 to 9/1/2019 (the "Policy"). Pursuant to an "ERP Endorsement" to the Policy, the Policy expiration date was extended to September 1, 2020.

---

[3] Bolded, capitalized language set forth herein is bolded and capitalized in Underwriters' Policy.

79.    The Policy's Limit of Liability is $5,000,000 in the aggregate for each "Policy Period," inclusive of "Defense Costs," subject to a $50,000 retention for each Claim. A true and accurate copy of the Policy is attached hereto as **Exhibit 6.**

80.    Item 1.A. of the Declarations specifies the Insured's Profession as "TELECOM   BUSINESS   LOAN   ORIGINATION;   TELECOM   BUSINESS FACTORING ORIGINATION."  (Ex. 6 at p. 6)

81.    The Retroactive Date of the Policy is September 1, 2018, which is also the date on which coverage incepted.  (Ex. 6 at p. 6)

82.    The legend at the top of the Professional Services Liability form states as follows:

**PROFESSIONAL SERVICES LIABILITY POLICY**

**THIS POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.    CLAIMS EXPENSES REDUCE AND MAY EXHAUST THE COVERAGE LIMITS, AND ARE SUBJECT TO THE RETENTION.**

* * *

83.    Item 8 of the Policy's Declarations provides that the Underwriters' agent for Notice of Claim is: Mr. John K. Silk, of Karbal, Cohen, Economou, Silk & Dunne, LLC, at 150 South Wacker Drive, 17th Floor, in Chicago, Illinois 60606.  (Ex. 6 at p. 6)

84.    The Insuring Agreement of the Policy provides:

**I.    INSURING AGREEMENT**

The Company will pay on behalf of the **INSURED LOSS** in excess of the Retention stated in Item 4 of the Declarations which the **INSURED** shall become legally obligated to pay as a result of any **CLAIM** first made against the **INSURED** during the **POLICY PERIOD** for a **WRONGFUL ACT** that occurred on or after the Retroactive Date stated in Item 6 of the Declarations.

(Ex. 6 at p. 7)

85.    The Policy defines "**INSURED**" as follows:

A.    **"INSURED"** means the individual, partnership, corporation or other entity named in Item 1 of the Declarations and shall include all persons who were, are or shall become: 1) directors, officers, partners or employees of the **INSURED** while acting within the scope of their duties as such; and 2) the executors, heirs, legal representatives or assigns of each **INSURED** otherwise insured herein in the event of his or her death, incompetency, insolvency or bankruptcy.

(Ex. 6 at p. 8)

86.    The Policy defines "**WRONGFUL ACT**" as follows:

A.    **"WRONGFUL ACT"** means any actual or alleged negligent act, negligent error or negligent omission committed by the **INSURED** solely in the performance of or failure to perform professional services for others in the **INSURED'S** Profession as stated in Item 1.A. of the Declarations.

87.    The Policy defines "**LOSS**" as follows:

C.    **"LOSS"** means money damages, settlements, and **DEFENSE COSTS. LOSS** shall not include:

1.    punitive or exemplary damages or the multiplied portion of a multiplied damages award

2.    criminal or civil fines or penalties imposed by law;

3.    taxes;

4.    matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed.

88.    The Policy defines "**POLICY PERIOD**" as follows:

D.    **"POLICY PERIOD"** means the period from the inception date of this Policy to the expiration date stated in Item 2 of the Declarations, or to any earlier cancellation date of this Policy.

89. The Policy defines "**DEFENSE COSTS**" as follows:

E. **"DEFENSE COSTS"** means reasonable and necessary legal fees and expenses incurred with the approval of the Company in connection with the investigation, adjustment, settlement, defense or appeal of a **CLAIM** made against an **INSURED** for a **WRONGFUL ACT**, and shall include the cost of attachment or similar bonds. Payment of **DEFENSE COSTS** by the Company shall reduce, and may exhaust, the Limit of Liability under this Policy.

**"DEFENSE COSTS"** shall not include salaries, wages, fees, overhead, overtime, or benefit expenses incurred by or associated with the **INSUREDS**.

90. The Policy defines "**CLAIM**" as follows:

F. **"CLAIM"** means a written demand for money damages received by an **INSURED**, including service of suit and the institution of administrative or arbitration proceedings. (Ex. 6 at p. 8)

91. The Policy defines "Interrelated Wrongful Acts" as follows:

G. **"INTERRELATED WRONGFUL ACTS"** means **WRONGFUL ACTS** that have as a common nexus any fact, circumstance, situation, event or transaction or series of facts, circumstances, situations, events or transactions. (Ex. 6 at p. 9)

92. The Policy contains the following "**DEFENSE AND SETTLEMENT**" condition:

**II.     DEFENSE AND SETTLEMENT**

Subject to Article V.B., the Company shall have the right and duty to defend any **CLAIM** against the **INSURED** to which this insurance applies, even if any of the allegations of the **CLAIM** are groundless, false or fraudulent.

The Company shall have the right to negotiate the settlement of any **CLAIM**, whether within or above the Retention, but the Company shall not commit the **INSURED** to any settlement without the **INSURED'S** consent, such consent not to be unreasonably withheld. The **INSURED** shall not admit liability for or settle any

**CLAIM** or incur any **DEFENSE COSTS** without the written consent of the Company, such consent not to be unreasonably withheld.  If the **INSURED** refuses to consent to any settlement recommended by the Company and agreed to by the claimant, and elects to contest any **CLAIM** or continue any legal proceedings in connection with such **CLAIM**, then, subject to the Limit of Liability of this Policy, the Company's liability for the **CLAIM** shall be limited to the amount in excess of the Retention which the Company would have contributed to the settlement had the **INSURED** consented to such settlement plus the **DEFENSE COSTS** incurred up to the date of such refusal. (Ex. 6 at p. 7-8)

93.     The Policy also contains the following "**NOTICE**" condition:

**VI.     NOTICE AND LOSS PROVISIONS**

A.     As a condition precedent to the availability of the rights provided under this Policy, the **INSURED** shall give written notice to the Company of any **CLAIM** made against the **INSURED** as soon as practicable, but in no event later than sixty (60) days after the date such **CLAIM** is first made.

* * *

C.     The notifications provided for above shall be made to the party set forth in Item 8 of the Declarations. (Ex. 6 at p. 17-18)

94.     The Policy also contains the following relevant exclusions:

**IV.     EXCLUSIONS**

This Policy does not apply to **LOSS** in connection with any **CLAIM**:

A.     based upon or directly or indirectly arising out of or resulting from an **INSURED** gaining in fact any personal profit or advantage to which the **INSURED** is not legally entitled;

B.     that results in a judgment or final adjudication that any **INSURED** has committed any criminal, dishonest, intentionally malicious, or fraudulent act, error or omission.

However, any **WRONGFUL ACT** pertaining to any of the **INSUREDS** shall not be imputed to any other person for the purposes of determining the applicability of Exclusions A. and B;

C.     based upon or directly or indirectly arising out of or resulting from any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease, or death, including but not limited to loss of consortium or services, or any actual or alleged damage to or loss of or destruction of any tangible property, including loss of use thereof;

D.     brought by or on behalf of one **INSURED** under this Policy against another **INSURED** under this Policy, except where:

    1.     such **CLAIM** arises out of the performance of or failure to perform professional services for the claimant **INSURED** as a client in the **INSURED'S** Profession as stated in Item I.A. of the Declarations; or

    2.     such **CLAIM** is in the form of a cross claim, third-party claim or otherwise for contribution or indemnity and is party of and results directly from a **CLAIM** which is not otherwise excluded by the terms of this Policy;

\* \* \*

J.     seeking relief or redress in any form other than money damages including but not limited to **CLAIM(S)** for injunctive relief in any form whatsoever and including disciplinary proceedings;

\* \* \*

N.     to the extent that there is coverage under any other existing valid policy or policies, whether such other insurance is stated to be contributory, excess, contingent or otherwise and regardless of whether or not such **LOSS** is collectible or recoverable under such other insurance; provided, however, that this exclusion shall not apply to any **LOSS** in excess of the retention and limit of liability of such other policy or policies where such **CLAIM** is otherwise covered under the terms of this Policy;

O.     based upon or directly or indirectly arising out of or resulting from any actual or alleged:

1.     **WRONGFUL ACT** or matter, fact, circumstance, situation, event or transaction that has been the subject of any claim made prior to the inception of this Policy or of any notice given during any prior policy;

2.     **WRONGFUL ACT** which, together with a **WRONGFUL ACT** that has been the subject of any claim or notice identified in O.1. above, would constitute **INTERRELATED WRONGFUL ACTS**; or

3.     Matter, fact, circumstance, situation, event or transaction known to an **INSURED** prior to the Coverage Date set forth in Item 7 of the Declarations if such matter, fact or circumstance would cause a reasonable person to believe that a **CLAIM** for a **WRONGFUL ACT** may be made;

*   *   *

Q.     based upon or directly or indirectly arising out of or resulting from any actual or alleged assumption by the **INSURED** under any contract or agreement of the liability of others, unless such liability would have attached to the **INSURED** in the absence of such contract or agreement;

*   *   *

S.     based upon or directly or indirectly arising out of or resulting from any actual or alleged **MONEY LAUNDERING** or any actual or alleged act which is in breach of and/or constitutes an offence under any money laundering legislation (or any provisions and/or rules or regulations made by any regulatory body or authority thereunder);

T.     based upon or directly or indirectly arising out of or resulting from any actual or alleged advertising or solicitation activities of an **INSURED**;

*   *   *

Y.     based upon or directly or indirectly arising out of or resulting from any actual or alleged breach by an Insured of an agreement to hold harmless or indemnify

an investor, purchaser or lender in connection with a loan originated, made, held or sold by an Insured;

* * *

CC.   brought against the Parent or affiliated entities of a corporation named in Item 1 of the Declarations, or brought by or on behalf of a Parent or affiliated entities of a corporation named in Item 1 of the Declarations. The term "Parent" means, for purposes of this Exclusion, a corporation that owns more than 50% of the voting stock of the corporation, if any, named in Item 1 of the Declarations;

* * *

FF.   based upon or directly or indirectly arising out of or resulting from the insolvency or bankruptcy of any Insured or of any other entity including but not limited to the failure, inability, or unwillingness to pay Claims, losses, or benefits due to the insolvency, liquidation or bankruptcy of any such individual or entity.

(Ex. 6 at p. 10-13, 16)

95.   The Specific Claim Exclusion, Endorsement A21(A) of the Policy provides, in relevant part as follows:

In consideration of the premium paid, it is hereby understood and agreed that this Policy does not apply to LOSS directly or indirectly based upon or arising out of or resulting from any CLAIM previously submitted to Underwriters or any other Insurer or for any CLAIM that should have been or could have been submitted if no applicable insurance was in force at the time, or for any CLAIM involving similar or interrelated matters, facts, circumstances, situations, events or transactions described in the application or previous applications, attachments or any other descriptive information submitted to Underwriters or prior Insurers including but not limited to:

**TALKING CAPITAL LLC/BRAD REIFLER**

And any other Claims or information described in this endorsement whether attached to this endorsement or not.

The effective date of this endorsement is <u>September 01, 2018</u>.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

(Ex. 6 at p. 35)

96.    The Policy contains an Additional Insured Endorsement (Endorsement A66) which states:

It is hereby understood and agreed that the following entities are added as additional Insureds:

**VOIP GUARDIAN PARTNERS I, LLC**

**VOIP GUARDIAN II, LLC**

**VOIP GUADIAN PARTNERS II, LLC**

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

Effective Date of this endorsement is September 01, 2018.

(Ex. 6 at p. 37)

97.    The Policy contains the following provisions with respect to Multiple **INSUREDS,  CLAIMS or CLAIMANTS**:

**V.     LIMIT OF LIABILITY AND RETENTION**

**\*\*\***

**C.     MULTIPLE INSUREDS, CLAIMS OR CLAIMANTS**

The inclusion herein of more than one **INSURED** or the making of **CLAIM(S)** by more than one person or organization shall not operate to increase the Company's Limit of Liability. **CLAIM(S)** arising out of a single **WRONGFUL ACT**, or **INTERRELATED WRONGFUL ACTS**, shall be treated as a single **CLAIM**, and such single **CLAIM** shall be considered first made:

1.    when the earliest **CLAIM** within such single **CLAIM** was first made, or

2.    when notice was first given under any policy of insurance of any **WRONGFUL ACT** or any matter, fact, circumstance, situation event or transaction that underlies any **CLAIM** within such single **CLAIM**,

and all such **CLAIM(S)** shall be subject to the same Limit of Liability.

(Ex. 6 at p. 16-17).

98.    The Policy contains the following "Assistance and Cooperation" requirements:

**VII.        GENERAL CONDITIONS**

          ***

          **E.    ASSISTANCE AND COOPERATION**

          The **INSURED** shall cooperate with the Company and, upon the Company's request, shall submit to examination and interrogation by a representative of the Company, under oath if required, and shall attend hearings, depositions, and trials and shall assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, and in the conduct of suits, as well as in the giving of a written statement or statements to the Company's representatives and meeting with such representatives for the purpose of investigation and/or defense, all without charge to the Company.  The **INSURED** shall further cooperate with the Company and do whatever is necessary, including authorizing claims, actions, or proceedings in the **INSURED'S** name against others, to secure and effect any rights of indemnity, contribution or apportionment which the **INSURED** may have.  The **INSURED** shall not demand or agree to arbitration of any **CLAIM** made against the **INSURED** without the prior written consent of the Company thereto, which consent shall not be unreasonably withheld.

(Ex. 6 at p. 21).

99.    The Policy also provides as follows regarding a "**FALSE OR FRAUDULENT CLAIM**":

**VII.        GENERAL CONDITIONS**

          ***

### M.    FALSE OR FRAUDULENT CLAIM

If an **INSURED** shall fraudulently proffer any **CLAIM** with respect to the amount thereof or otherwise, this Policy shall become void and all coverage hereunder shall be forfeited.

(Ex. 6 at p. 23).

### FIRST CLAIM FOR RELIEF
### DECLARATORY JUDGMENT –DLI LAWSUIT
### (No Duty to Defend or Indemnify Omanoff)

100.    Underwriters incorporate by reference the allegations of Paragraphs 1 through 100 above as though fully set forth herein.

101.    The DLI Lawsuit was tendered to Underwriters for defense and indemnity on behalf of Omanoff.

102.    Underwriters agreed to fund Omanoff's defense against the DLI Lawsuit subject to a prior express written reservation of all of Underwriters' rights to disclaim any and all obligations under the Policy, including, but not limited to, the right to deny the claim and recoup all defense fees and costs paid by Underwriters.

103.    The Insuring Agreement of the Policy extends coverage only for **CLAIMS** made against an Insured for a **WRONGFUL ACT**.

104.    **WRONGFUL ACT** is defined by the Policy as "any actual or alleged negligent act, negligent error or negligent omission committed by the **INSURED** solely in the performance of or failure to perform professional services for others in the **INSURED'S** Profession as stated in Item 1.A. of the Declarations."

105.    The DLI Lawsuit does not allege a negligent act, negligent error or negligent omission against any Insured.

106.    The DLI Lawsuit also does not allege a negligent act, negligent error or negligent omission by any Insured "solely in the performance of or failure to perform professional services for others in the **INSURED'S** Profession of "Telecom Business Loan Origination; Telecom Business Factoring Origination."

107.   The DLI Lawsuit therefore does not trigger coverage under the Insuring Agreement of the Policy.

108.   Alternatively, the Policy does not cover **WRONGFUL ACTS** that occurred prior to the Retroactive Date of September 1, 2018, which is also the date of the Policy's inception.

109.   Based on the allegations in the DLI Lawsuit, which incorporates the complained of conduct in the Talking Capital Lawsuit, any alleged **WRONGFUL ACTS** occurred prior to September 1, 2018, and therefore the DLI Lawsuit is not covered by the Policy because under the Policy's Insuring Agreement, it only covers Wrongful Acts occurring on or after the Retroactive Date.

110.   Alternatively, the Talking Capital Lawsuit, described herein and in the DLI Lawsuit, share "as a common nexus any fact, circumstance, situation, event or transaction or series of facts, circumstances, situations, events or transactions." Therefore, to the extent this Court determines there are **WRONGFUL ACTS** alleged in the DLI Lawsuit, they constitute **INTERRELATED WRONGFUL ACTS** with the Talking Capital Lawsuit and a single **CLAIM** pursuant to **Section V.C.** of the Policy.

111.   Section V.C. provides that such **CLAIM** is considered first made at the time of the earliest **CLAIM**, the Talking Capital Lawsuit, which was made on February 24, 2017, prior to the inception of the Policy.  The DLI Lawsuit is therefore not covered under the Insuring Agreement because it is not a **CLAIM** first made against the **INSURED** during the **POLICY PERIOD**.

112.   Alternatively, the "Specific Claim Exclusion" of the Policy states there is no coverage available for **LOSS** arising out of any **CLAIM** involving similar or interrelated acts, facts, circumstances, situations, events, or transactions described in the application or any descriptive information submitted to Underwriters, including specifically, "Talking Capital LLC/BRAD REIFLER."

113.   There is thus no coverage under the Policy for the DLI Lawsuit because it involves similar or interrelated acts, facts, circumstances, situations or events to the

Talking Capital Lawsuit and is therefore wholly excluded by the "Specific Claim Exclusion."

114. Alternatively, under Sections IV.A. and IV.B., there is no coverage based on the VoIP Complaint's allegations of intentional fraud and fraudulent and improper transfers of funds.

115. Alternatively, under California Insurance Code §533, an insurer is not liable for indemnification of **LOSS** caused by an insured's willful acts.

116. Alternatively, under Section IV.J. of the Policy, there is no **LOSS** (which includes defense) owed for relief in any form other than money damages. However, the DLI Lawsuit seeks a variety of relief, including recission, disgorgement, and other equitable relief.

117. Alternatively, the DLI Lawsuit alleges that Omanoff knew that DLI, Ross, Mason, and Turner had performed grossly inadequate due diligence regarding loans made to VoIP GP I from 2015 to 2017, and therefore there is no coverage under the exclusion contained in Section IV.O.3. of the Policy for matters, facts, circumstances, events, situations or transactions known to an **INSURED** prior to the Coverage Date of September 1, 2018.

118. Alternatively, there is no coverage for the DLI Lawsuit under Section IV.T. for solicitation activities because the DLI Lawsuit alleges that Omanoff solicited DLI investor funds knowing that DLI, Ross, Mason, and Turner had performed grossly inadequate due diligence regarding loans made to VoIP GP I.

119. Alternatively, the DLI Lawsuit is based upon or directly or indirectly arises out of or results from the bankruptcy or insolvency of any Insured or any other entity and is therefore not covered pursuant to Section IV.FF.

120. Alternatively, Plaintiffs in the DLI Lawsuit seek, among other things, restitution, disgorgement and punitive damages. **LOSS** in Section IIIC of the Policy does not include punitive damages, refunds, restitution, or disgorgement. Therefore, there is no coverage for these damages.

121.   Alternatively, VoIP Guardian answered "no" when Underwriters asked in Question 36.a. of its Policy application whether it or any of its partners, directors, etc. had any reasonable basis to believe that there had been a breach of a professional duty. Also, while VoIP Guardian answered "yes" when asked in Question 36.b. whether it or any of its partners, directors, etc. were aware of any circumstances, incidents, or situations during the past five years which may result in claims being made against it or any of its partners, directors, etc., it appears that Talking Capital was the only situation identified.  There is no coverage to the extent the DLI Lawsuit emanates from any fact, circumstance, or situation of which an Insured had knowledge pursuant to the exclusion printed in **BOLD** at the end of Question 36 of the Policy application.

122.   Alternatively, coverage counsel for the Omanoff Parties has reported that former independent *Cumis* counsel for the Omanoff Parties, Cynthia Cohen: (a) assisted in drafting the allegations of a complaint against her own clients for the purpose of attempting to engage and/or increase the insurance coverage potentially available to the Trustee; and (b) assisted in preparing a "sham" demand for policy limits in an attempt to "set up" Underwriters for a bad faith claim.

123.   VoIP Guardian and Omanoff, by the conduct of their representative Ms. Cohen, materially breached the "Assistance and Cooperation" duties imposed upon all **INSUREDS** under the Policy and have prejudiced Underwriters in the defense of this **CLAIM** by providing material support to an opposing claimant and increasing the exposure to Underwriters' **INSUREDS**.

124.   Accordingly, there is no coverage for the DLI Lawsuit based on VoIP Guardian and Omanoff's breach of the "Assistance and Cooperation" clause of the Policy.

125.   Additionally, there is no coverage for the DLI Lawsuit because independent counsel for the Omanoff Parties has violated her duties under California Civil Code § 2860.

126. Further, VoIP Guardian and Omanoff, by the conduct of their representative Ms. Cohen, proffered to Underwriters a false or fraudulent **CLAIM** that was prepared with the material participation of their own independent *Cumis* counsel, thereby rendering any coverage under the Policy void in accordance with Section VII.M. of the Policy.

127. There are additional terms and conditions that limit or preclude coverage for this matter. Accordingly, Underwriters reserve the right to assert such terms and conditions should their applicability become apparent as a result of discovery in this case.

## SECOND CLAIM FOR RELIEF
## DECLARATORY JUDGMENT – THE WAVECREST LAWSUIT
### (No Duty to Defend or Indemnify VoIP GP II)

128. Underwriters incorporate by reference the allegations of Paragraphs 1 through 128 above as though fully set forth herein.

129. The Wavecrest Lawsuit was tendered to Underwriters for defense and indemnity on behalf of only VoIP GP II.

130. Underwriters agreed to fund only VoIP GP II's defense against the Wavecrest Complaint subject to a prior and express written reservation of all of Underwriters' rights to disclaim any and all obligations under the Policy, including, but not limited to, the right to deny the claim and to recoup all defense fees costs paid by Underwriters.

131. The Insuring Agreement of the Policy extends coverage only for "**CLAIMS**" made against an Insured for a "**WRONGFUL ACT**."

132. **WRONGFUL ACT** is defined by the Policy as "any actual or alleged negligent act, negligent error or negligent omission committed by the **INSURED** solely in the performance of or failure to perform professional services for others in the **INSURED'S** profession as stated in Item 1.A. of the Declarations."

133. The Wavecrest Complaint does not allege a negligent act, negligent error

or negligent omission against any **INSURED**.

134.  The Wavecrest Complaint also does not allege a negligent act, negligent error, or negligent omission by any **INSURED** "solely in the performance of or failure to perform professional services for others in the **INSURED'S** Profession as stated in Item 1.a. of the Declarations," *i.e.*, Telecom Business Loan Origination; Telecom Business Factoring Origination.

135.  The Wavecrest Complaint therefore does not trigger coverage under the Insuring Agreement of the Policy.

136.  Alternatively, the Policy does not cover **WRONGFUL ACTS** that occurred prior to the Retroactive Date of September 1, 2018, which is also the date of the Policy's inception.

137.  Based on the allegations in the Wavecrest Complaint, VoIP GP II entered into a factoring agreement and security assignment with Interstach on February 6, 2018, and a factoring agreement and security assignment with AMA on February 4, 2018, both of which serve as the predicate for the Declaratory Relief claim asserted by the trustee for VoIP GP I.  Therefore, the Wavecrest Complaint is not covered by the Policy because, under the Policy's Insuring Agreement, it only covers **WRONGFUL ACTS** occurring on or after the September 1, 2018 Retroactive Date.

138.  Alternatively, the Talking Capital Lawsuit and the Wavecrest Complaint share "as a common nexus any fact, circumstance, situation, event or transaction or series of facts, circumstances, situations, events or transactions."  Therefore, to the extent this Court determines there are **WRONGFUL ACTS** alleged in the Wavecrest Complaint, they constitute **INTERRELATED WRONGFUL ACTS** with the Talking Capital Lawsuit and a single **CLAIM** pursuant to **Section V.C.** of the Policy.

139.  Section V.C. provides that such **CLAIM** is considered first made at the time of the earliest **CLAIM**, the Talking Capital Lawsuit, which was first made on February 24, 2017, prior to the inception of Underwriters' Policy.  Therefore, the Wavecrest Complaint is not covered under the Insuring Agreement because it is not a

**CLAIM** first made against the **INSURED** during the **POLICY PERIOD**.

140.   Alternatively, the Wavecrest Complaint is brought by the Trustee on behalf of the Debtor, i.e., VoIP GP I, against VoIP GP II, both of which are insureds under the Policy.  Section IV.D. excludes coverage for a claim by one insured against the other.

141.   Alternatively, the Wavecrest Complaint contains a claim for retention of benefits conferred. Under California law, which governs coverage under the Policy, disgorgement of improper gain is not insurable, and therefore no coverage is available for this claim for relief.

142.   Alternatively, the Wavecrest Complaint seeks, among other things, punitive and exemplary damages.  **LOSS** in Section III.C. of the Policy does not include punitive or exemplary damages. Therefore, there is no coverage for these damages.

143.   Alternatively, the Wavecrest Complaint contains a claim against VoIP GP II, seeking declaratory relief. Section IV.J. of the Policy fully excludes coverage for relief in any form other than money damages.

144.   Alternatively, the Wavecrest Complaint contains allegations of breach of contractual obligation. To the extent the Court determines these are allegations of **WRONGFUL ACTS**, Section IV.Q. (liability of others assumed under agreement) excludes coverage for this claim for relief.

145.   Alternatively, Section IV.FF of the Policy excludes coverage "based upon or directly or indirectly arising out of or resulting from the insolvency or bankruptcy of [the] Insured[.]" But for the bankruptcy of VoIP GP I, the Wavecrest Complaint would not exist, and therefore coverage is wholly excluded.

146.   Alternatively, under Sections IV.A. and IV.B., there is no coverage based on the Wavecrest Complaint's allegations that VoIP GP II was incorrectly identified as the "factor" with respect to loans funded by VoIP GP I to Interstach and AMA.

147.   Alternatively, under California Insurance Code §533, an insurer is not liable for indemnification of **LOSS** caused by an insured's willful acts.

148.   Alternatively, the Wavecrest Complaint alleges that, as of December 2016,

Omanoff knew that Wavecrest raised a number of red flags, but nevertheless VoIP GP I entered into factoring agreements and assignments with Interstach and AMA. Therefore, there is no coverage under the exclusion contained in Section IV.O.3. of the Policy for matters, facts, circumstances, events, situations or transactions known to an **INSURED** prior to the Coverage Date of September 1, 2018.

149.   Alternatively, there is no coverage under Sections IV.CC because the Wavecrest Lawsuit is brought by VoIP GP I, which is an affiliated entity of VoIP Guardian.

150.   Alternatively, VoIP Guardian answered "no" when Underwriters asked in Question 36.a. of its Policy application whether it or any of its partners, directors, etc. had any reasonable basis to believe that there had been a breach of a professional duty. Also, while VoIP Guardian answered "yes" when asked in Question 36.b. whether it or any of its partners, directors, etc. were aware of any circumstances, incidents, or situations during the past five years which may result in claims being made against it or any of its partners, directors, etc., it appears that Talking Capital was the only situation identified.  There is no coverage to the extent the Wavecrest Complaint emanates from any fact, circumstance, or situation of which an Insured had knowledge pursuant to the exclusion printed in **BOLD** at the end of Question 36 of the Policy application.

151.   Alternatively, coverage counsel for the Omanoff Parties has reported that former independent *Cumis* counsel for the Omanoff Parties, Cynthia Cohen: (a) assisted in drafting the allegations of a complaint against her own clients for the purpose of attempting to engage and/or increase the insurance coverage potentially available to the Trustee; and (b) assisted in preparing a "sham" demand for policy limits in an attempt to "set up" Underwriters for a bad faith claim.

152.   VoIP Guardian and Omanoff, by the conduct of their representative Ms. Cohen, materially breached the "Assistance and Cooperation" duties imposed upon all **INSUREDS** under the Policy and have prejudiced Underwriters in the defense of this **CLAIM** by providing material support to an opposing claimant and increasing the

exposure to Underwriters' **INSUREDS**.

153.   Accordingly, there is no coverage for the DLI Lawsuit based on VoIP Guardian and Omanoff's breach of the "Assistance and Cooperation" clause of the Policy.

154.   Additionally, there is no coverage for the DLI Lawsuit because independent counsel for the Omanoff Parties has violated her duties under California Civil Code § 2860.

155.   Further, VoIP Guardian and Omanoff, by the conduct of their representative Ms. Cohen, proffered to Underwriters a false or fraudulent **CLAIM** that was prepared with the material participation of their own independent *Cumis* counsel, thereby rendering any coverage under the Policy void in accordance with Section VII.M. of the Policy.

156.   All defenses and limitations to coverage set forth in Count I of this Complaint with respect to the DLI Lawsuit are equally applicable to the Wavecrest Complaint, to the extent the Court concludes that the DLI Lawsuit and the Wavecrest Complaint involve **INTERRELATED WRONGFUL ACTS** and therefore constitute a single **CLAIM** pursuant to Section V.C. Of the Policy.

157.   There are additional terms and conditions that limit or preclude coverage for this matter.  Accordingly, Underwriters reserve the right to assert such terms and conditions should their applicability become apparent as a result of discovery in this case.

### THIRD CLAIM FOR RELIEF
### DECLARATORY JUDGMENT – THE VOIP LAWSUIT
**(No Duty to Defend or Indemnify Omanoff, VoIP Guardian, Proto, Rahman, Philipson, A. Philipson, Richard Omanoff, Omanoff America, LLC, Contacts & Contracts, LLC, Omanoff America Telecom, LLC, Philipson International, LLC, and Mudmonth, LLC)**

158.   Underwriters incorporate by reference the allegations of Paragraphs 1 through 157 above as though fully set forth herein.

159.   The VoIP Lawsuit was tendered to Underwriters for defense and indemnity on behalf of Omanoff, VoIP Guardian, Richard Omanoff, Omanoff America, LLC, Contacts & Contracts, LLC, and Omanoff America Telecom, LLC.

160.   The VoIP Lawsuit was also tendered to Underwriters for defense and indemnity on behalf of Philipson, who later withdrew such tender.

161.   Underwriters are informed and believe, and based thereon allege, that Proto, Mudmonth, LLC, Rahman, A. Philipson, Philipson International, LLC, and each of them, have claimed or may claim some right to a defense and/or indemnity against the VoIP Lawsuit.

162.   There is no potential coverage under the Policy for Richard Omanoff, Omanoff America, LLC, Contracts & Contracts, Inc., Omanoff America Telecom, LLC, Mudmonth, LLC, and Philipson International, LLC because they are not persons who were, are or shall become (1) directors, officers, partners or employees of the **INSURED** while acting with the scope of their duties as such, or (2) the executors, heirs, legal representatives or assigns of each **INSURED** otherwise insured under the Policy in the event of his or her death, incompetency, insolvency or bankruptcy. Therefore, Richard Omanoff, Omanoff America, LLC, Contracts & Contracts, Inc., Omanoff America Telecom, LLC, Mudmonth, LLC, and Philipson International, LLC do not meet the definition of an **INSURED** under the Policy and are not entitled to coverage.

163.   With respect to Omanoff and VoIP Guardian, Underwriters agreed to fund their defense against the VoIP Lawsuit subject to a prior express written reservation of all of Underwriters' rights to disclaim any and all obligations under the Policy, including, but not limited to, the right to deny the claim and to recoup all defense fees and costs.

164.   However, the VoIP Complaint alleges Omanoff, VoIP Guardian and other defendants fraudulently obtained and diverted investor funds for personal gain. Therefore, the VOIP Complaint does not allege a **WRONGFUL ACT** because the

allegations do not involve negligent acts, negligent errors, or negligent omissions solely in the performance of or failure to perform professional services for others in the **INSURED'S** profession of "TELECOM BUSINESS LOAN ORIGINATION; TELECOM BUSINESS FACTOR ORIGINATION."

165.   The VoIP Complaint thus does not trigger coverage under the Insuring Agreement of the Policy.

166.   Additionally, the Policy does not cover **WRONGFUL ACTS** that occurred prior to the Retroactive Date of September 1, 2018, which is also the date of the Policy's inception.

167.   Based on the allegations in the VoIP Complaint, which include allegations of an ongoing fraud scheme involving Omanoff; other directors, officers, and/or employees of VoIP GP I; and the managing partner of VoIP Guardian dating back prior to September 1, 2018, any **WRONGFUL ACTS** occurred prior to September 1, 2018, and therefore the VoIP Lawsuit is not covered by the Policy because, under the Policy's Insuring Agreement, there is only coverage for a **WRONGFUL ACT** occurring on or after the Retroactive Date.

168.   Additionally, the VoIP Complaint and the Talking Capital Lawsuit share "as a common nexus any fact, circumstance, situation, event or transaction or series of facts, circumstances, situations, events or transactions."   Therefore, to the extent this Court determines there are **WRONGFUL ACTS** alleged in the VoIP Complaint, they constitute **INTERRELATED WRONGFUL ACTS** with the Talking Capital Lawsuit and a single **CLAIM** pursuant to **Section V.C.** of the Policy.

169.   Section V.C. provides that such **CLAIM** is considered first made at the time of the earliest **CLAIM**, the Talking Capital Lawsuit, which was made on February 24, 2017, prior to the inception of Underwriters' Policy.   Therefore, the VoIP Lawsuit is not covered under the Insuring Agreement because it is not a **CLAIM** first made against the **INSURED** during the **POLICY PERIOD**.

170.   Additionally, the "Specific Claim Exclusion" of the Policy states there is no coverage available for **LOSS** arising out of any **CLAIM** involving similar or interrelated acts, facts, circumstances, situations, events, or transactions described in the application or any descriptive information submitted to Underwriters, including specifically, "Talking Capital LLC/BRAD REIFLER."

171.   The VoIP Complaint alleges a complex fraud scheme involving Omanoff, other alleged directors, officers, and/or employees of VoIP GP I and/or VoIP Guardian, and the managing partner of VoIP Guardian, among others.   The VoIP Complaint further outlines numerous fraudulent and improper transfers of VoIP GP I funds.

172.   The VoIP Lawsuit thus involves "similar or interrelated matters, facts, circumstances, situations, events or transactions" as those involved in the Talking Capital LLC matter, which is specifically referenced in the "A21(A) SCE 1" Endorsement, titled the "Specific Claim Exclusion."   For example, the VoIP Complaint references the Talking Capital lawsuit's allegations of "a litany of misconduct including the lending of millions of dollars to a suspect Tier 3 borrower that disappeared under suspicious circumstances (with substantial evidence that the purported borrower was a dummy company used to funnel money out of Talking Capital under the guise of legitimate commerce) and that Omanoff was grossly negligent in his duties as the manager of Talking Capital and its affiliates."   The VoIP Complaint goes on to allege that the DLI Lawsuit cited the Talking Capital Lawsuit because "the existence of the substantiated allegations of Omanoff's gross misconduct *in a materially identical business venture* put DLI's management on notice that Omanoff was not trustworthy and was, at a minimum, grossly negligent in vetting and monitoring the investment of funds in its Tier 3 borrowers."   (Emphasis added.)   In light of these allegations, there is no coverage owed under the "Specific Claim Exclusion" Endorsement quoted above (numbered "A21(A) SCE 1").

173.   Additionally, the Policy definition of an "**INSURED**" is limited to persons who were, are or shall become (1) directors, officers, partners or employees of the

**INSURED** while acting with the scope of their duties as such, or (2) the executors, heirs, legal representatives or assigns of each **INSURED** otherwise insured under the Policy in the event of his or her death, incompetency, insolvency or bankruptcy.

174.   The VoIP Complaint alleges that Omanoff, along with other alleged directors, officers, and/or employees of VOIP GP I and/or VoIP Guardian, the managing partner of VoIP Guardian, as well as other Defendants, participated in a fraud scheme involving other non-insured entities.   To the extent Omanoff, or anyone else who might otherwise be eligible for **INSURED** status under the Policy, was not acting within the scope of his or her duties as a director, officer, partner or employee of the **INSURED**, he/she does not meet the Policy's definition of an **INSURED** and is not entitled to coverage under the Policy.

175.   Additionally, under Sections IV.A. and IV.B., there is no coverage based on the VoIP Complaint's allegations of intentional fraud and fraudulent and improper transfers of funds.

176.   Additionally, under California Insurance Code §533, an insurer is not liable for indemnification of loss caused by an insured's willful acts.

177.   Additionally, under Section IV.D. of the Policy, claims brought by one **INSURED** against another **INSURED** are not covered.   In this regard, the VoIP Lawsuit is filed by the Trustee on behalf of the Debtor, VoIP GP I, an **INSURED** under the Policy, against one or more other **INSUREDS** under the Policy, including Omanoff and VoIP Guardian.   There is thus no coverage for the VoIP Lawsuit pursuant to Section IV.D. of the Policy.

178.   Additionally, under Section IV.J. of the Policy, there is no **LOSS** (which includes defense costs) owed for relief in any form other than money damages. However, the VoIP Complaint seeks a variety of relief, including disgorgement and the avoidance of various fraudulent and improper transfers.

179.   Additionally, the VoIP Complaint alleges a fraud scheme involving Omanoff dating back to 2015, and therefore there is no coverage for the VoIP Lawsuit

based on the exclusion contained in Section IV.O.3. of the Policy for claims arising out of matters, facts, circumstances, events, situations or transactions known to an **INSURED** prior to September 1, 2018.

180.   Additionally, there is no coverage under Section IV.S. because the VoIP Lawsuit alleges an underlying fraud scheme perpetrated by Omanoff to wrongfully obtain DLI investors' funds, which the Trustee now seeks to recover as alleged improper, fraudulent transfers.

181.   Additionally, there is no coverage for the VoIP Lawsuit under Section IV.T. for solicitation activities because the VoIP Complaint alleges that Omanoff solicited DLI investor funds as part of a fraudulent scheme.

182.   Additionally, there is no coverage under Sections IV.CC because the VoIP Lawsuit is brought by VoIP GP I, which is an affiliated entity of VoIP Guardian.

183.   Additionally, Section IV.FF. excludes loss in connection with claims arising out of the insolvency or bankruptcy of any Insured or of any other entity including but not limited to the failure, inability, or unwillingness to pay Claims, losses, or benefits due to the insolvency, liquidation or bankruptcy of any such individual or entity.  Here, the VoIP Lawuit is an adversary proceeding brought as a direct result of VoIP GP I's bankruptcy and insolvency, and, in turn, involves other entities' alleged bankruptcy or insolvency and alleged failure, inability, or unwillingness to pay monies.  Accordingly, there is no coverage for the VoIP Lawsuit based on the exclusion in Section IV.FF. of the Policy.

184.   Additionally, there is no coverage for the punitive and exemplary damages asserted in the VoIP Complaint because the definition of "**LOSS**" in Section III.C. of the Policy excludes punitive and exemplary damages.  There is also no coverage for the restitution/disgorgement sought in the VoIP Complaint because such does not meet the Policy definition of **LOSS**, and further, the return of money or property cannot be insured in California and does not constitute "damages" under an insurance policy.

185.   Additionally, VoIP Guardian answered "no" when Underwriters asked in Question 36.a. of its Policy application whether it or any of its partners, directors, etc. had any reasonable basis to believe that there had been a breach of a professional duty. Also, while VoIP Guardian answered "yes" when asked in Question 36.b. whether it or any of its partners, directors, etc. were aware of any circumstances, incidents, or situations during the past five years which may result in claims being made against it or any of its partners, directors, etc., it appears that Talking Capital was the only situation identified.  There is no coverage to the extent the VoIP Lawsuit emanates from any fact, circumstance, or situation of which an Insured had knowledge pursuant to the exclusion printed in **BOLD** at the end of Question 36 of the Policy application.

186.   Additionally, coverage counsel for the Omanoff Parties has reported that former independent *Cumis* counsel for the Omanoff Parties, Cynthia Cohen: (a) assisted in drafting the allegations of a complaint against her own clients for the purpose of attempting to engage and/or increase the insurance coverage potentially available to the Trustee; and (b) assisted in preparing a "sham" demand for policy limits in an attempt to "set up" Underwriters for a bad faith claim.

187.   VoIP Guardian and Omanoff, by the conduct of their representative Ms. Cohen, materially breached the "Assistance and Cooperation" duties imposed upon all **INSUREDS** under the Policy and have prejudiced Underwriters in the defense of this **CLAIM** by providing material support to an opposing claimant and increasing the exposure to Underwriters' **INSUREDS**.

188.   Accordingly, there is no coverage for the DLI Lawsuit based on VoIP Guardian and Omanoff's breach of the "Assistance and Cooperation" clause of the Policy.

189.   Additionally, there is no coverage for the DLI Lawsuit because independent counsel for the Omanoff Parties has violated her duties under California Civil Code § 2860.

190.   Further, VoIP Guardian and Omanoff, by the conduct of their representative Ms. Cohen, proffered to Underwriters a false or fraudulent **CLAIM** that was prepared with the material participation of their own independent *Cumis* counsel, thereby rendering any coverage under the Policy void in accordance with Section VII.M. of the Policy.

191.   All defenses and limitations to coverage set forth in Counts I and II of this Complaint with respect to the DLI Lawsuit and the Wavecrest Complaint are equally applicable to the VoIP Lawsuit, to the extent the Court determines that the DLI Lawsuit and/or the Wavecrest Complaint involve **INTERRELATED WRONGFUL ACTS** and therefore constitute a single **CLAIM** pursuant to Section V.C. Of the Policy.

192.   There are additional terms and conditions that limit or preclude coverage for this matter.  Accordingly, Underwriters reserve the right to assert such terms and conditions should their applicability become apparent as a result of discovery in this case.

### FOURTH CLAIM FOR RELIEF
### (Reimbursement of Incurred Legal Fees and Expenses)
### (Against VoIP Guardian, Omanoff, and VoIP GP II)

193.   Underwriters incorporate by reference the allegations of paragraphs 1 through 192 above as though set forth fully herein.

194.   In connection with Underwriters' provision of a defense of VoIP Guardian, Omanoff, and VoIP GP II in the DLI Lawsuit, the Wavecrest Lawsuit, and the VoIP Lawsuit, Underwriters have paid and continue to pay legal fees and expenses on behalf of these defendants pursuant to a full reservation of rights.

195.   As alleged more fully in support of Underwriters' First, Second, and Third Claims for relief, the DLI Lawsuit, the Wavecrest Lawsuit, and the VoIP Lawsuit allege claims against these defendants for which there is no potential or possibility of coverage under the terms of Underwriters' Policy, and for which there is no obligation to defend.

196.   Underwriters further allege, or allege in the alternative, that pursuant to the Policy's terms and conditions set forth more fully above, the DLI Lawsuit, the Wavecrest Lawsuit, and the VoIP Lawsuit never presented any potential for policy coverage, and Underwriters' duty to defend never arose in the first instance.

197.   Underwriters have a right of reimbursement implied in law as quasi-contractual of any defense costs, legal fees and expenses Underwriters have paid or incurred, or will pay or incur, on behalf of these defendants for the defense of claims for which there is no possibility of coverage under Underwriters' Policy.  (*Buss v. Superior Court,* 16 Cal.4th 35, 50 (1997).)

198.   Underwriters have a right to reimbursement of any and all defense costs, legal fees, and expenses Underwriters have paid or incurred or will pay or incur on behalf of these defendants for the defense of any suit that never presented any potential for coverage, such that Underwriters' duty to defend never arose in the first instance. (*Scottsdale Ins. Co. v. MV Transportation,* 36 Cal.4th 643, 657 (2005).)

199.   Underwriters are further entitled to prejudgment interest on any amounts Underwriters have paid or will pay for the defense of claims for which there is no possibility of coverage under Underwriters' Policy, payable from the time the funds were expended.  (*Evanston Ins. Co. v. OEA, Inc.,* 566 F.3d 915, 921 (9th Cir. 2009).)

200.   Underwriters reserve the right to amend this complaint to seek reimbursement of any amounts Underwriters may pay on behalf of these defendants in settlement of any of the underlying actions.  (*Blue Ridge Ins. Co. v. Jacobsen,* 25 Cal.4th 489, 503 (2001).)

201.   Based on the foregoing, Underwriters pray for reimbursement of all defense costs, legal fees and expenses Underwriters have paid or incurred, or will pay or incur, on behalf of these defendants, with interest, to the extent permitted by law.

**PRAYER FOR RELIEF**

As to the FIRST CLAIM FOR RELIEF, Underwriters pray for judgment as follows:

a. Declaring that Underwriters have no duty to defend Omanoff under the Policy with respect to the DLI Lawsuit;

b. Declaring that Underwriters have no duty to indemnify Omanoff under the Policy with respect to the DLI Lawsuit;

c. Declaring that Underwriters may cease defending Omanoff;

d. Declaring that Underwriters are entitled to recoup **DEFENSE COSTS** incurred and/or paid for the defense of Omanoff in the DLI Lawsuit; and,

e. Awarding Underwriters such other and further relief as the Court may deem appropriate and just.

As to the SECOND CLAIM FOR RELIEF, Underwriters pray for judgment as follows:

a. Declaring that Underwriters have no duty to defend VoIP GP II under the Policy with respect to the Wavecrest Complaint;

b. Declaring that Underwriters have no duty to indemnify VoIP GP II under the Policy with respect to the Wavecrest Complaint;

c. Declaring that Underwriters may cease defending VoIP GP II;

d. Declaring that Underwriters are entitled to recoup any **DEFENSE**

**COSTS** incurred and/or paid for the defense of VoIP GP II in the Wavecrest Complaint; and,

e. Awarding Underwriters such other and further relief as the Court may deem appropriate and just.

As to the THIRD CLAIM FOR RELIEF, Underwriters pray for judgment as follows:

a. Declaring that Underwriters have no duty to defend Omanoff, VoIP Guardian, Proto, Rahman, Philipson, A. Philipson, Richard Omanoff, Omanoff America, LLC, Contacts & Contracts, LLC, Omanoff America Telecom, LLC, Philipson International, LLC, or Mudmonth, LLC under the Policy with respect to the VoIP Lawsuit;

b. Declaring that Underwriters have no duty to indemnify Omanoff, VoIP Guardian, Proto, Rahman, Philipson, A. Philipson, Richard Omanoff, Omanoff America, LLC, Contacts & Contracts, LLC, Omanoff America Telecom, LLC, Philipson International, LLC, or Mudmonth, LLC under the Policy with respect to the VoIP Lawsuit;

c. Declaring that Underwriters may cease defending Omanoff and VoIP Guardian;

Declaring that Underwriters are entitled to recoup any **DEFENSE COSTS** incurred and/or paid for the defense of VoIP Guardian or Omanoff in the VoIP Lawsuit; and,

d. Awarding Underwriters such other and further relief as the Court may

**46**
**COMPLAINT**

1   deem appropriate and just.

2

3   As to the FOURTH CLAIM FOR RELIEF, Underwriters pray as follows:

4   a.  Awarding Underwriters all **DEFENSE COSTS** paid for the defense of

5       Omanoff in the DLI Lawsuit;

6

7   b.  Awarding Underwriters all **DEFENSE COSTS** paid for the defense of

8       VoIP GP II in the Wavecrest Lawsuit;

9

10  c.  Awarding Underwriters all **DEFENSE COSTS** paid for the defense of

11      VoIP Guardian and Omanoff in the VoIP Lawsuit;

12

13  d.  Awarding Underwriters prejudgment interest; and

14

15  e.  Awarding Underwriters such other and further relief as the Court may deem

16      appropriate and just.

17

18                              Respectfully submitted,

19  Date:   May 2, 2023          SHOECRAFT & ASSOCIATES

20

21                              By: */s/ Devin T. Shoecraft*_____
                                Robert D. Shoecraft

22                              Devin T. Shoecraft

23                              Attorneys for Plaintiff, Those Certain
                                Underwriters At Lloyd's, London

24                              subscribing to Policy No. SUA
                                WS20214-1801

25

26

27

28

**47**
**COMPLAINT**

**JURY TRIAL DEMANDED**

Underwriters pray for a trial by jury as to all claims so triable. (*American Motorists Ins. Co. v. Sup.Ct. (Montrose Chem. Corp. of Calif.)*, 68 Cal.App.4th 864, 874 (1998).)

Respectfully submitted,

Date:    May 2, 2023                    SHOECRAFT & ASSOCIATES

By: */s/ Devin T. Shoecraft*_____
Robert D. Shoecraft
Devin T. Shoecraft
Attorneys for Plaintiff, Those Certain
Underwriters At Lloyd's, London
subscribing to Policy No. SUA
WS20214-1801

**COMPLAINT**